NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0634n.06

No. 14-5534

FILED
Sep 10, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ERNEST WILLIAM SINGLETON, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:  SUHRHEINRICH and GRIFFIN, Circuit Judges; STAFFORD, District Judge.*

*SUHRHEINRICH*, Circuit Judge.

Ernest William Singleton ("Defendant") appeals his jury convictions for various drug and money laundering offenses stemming from the ownership and operation of two Kentucky pain management clinics. Defendant (1) challenges the sufficiency of the evidence supporting his convictions; (2) alleges instructional error; (3) contests two evidentiary rulings; (4) alleges prosecutorial misconduct; and (5) alleges cumulative error. For the following reasons, we **AFFIRM** Defendant's convictions.

## I. BACKGROUND

In December 2010, Defendant, a nurse by profession, opened the Central Kentucky Bariatric and Pain Management Clinic in Georgetown, Kentucky ("Georgetown Clinic"). In

---

* The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

May 2011, Defendant opened the nearby Grant County Wellness Center in Dry Ridge, Kentucky ("Dry Ridge Clinic").

At these two locations, patients obtained prescriptions for narcotic painkillers with little medical scrutiny or supervision. Between December 2010 and March 2012, the Georgetown and Dry Ridge Clinics prescribed over 2.5 million dosage units of Oxycodone, a "quite disturbing" amount of a frequently abused prescription drug.

A "constant flow" of patients visited the Georgetown and Dry Ridge Clinics. Patients often drove to the clinics from distant counties and states, and some visitors even carpooled together. The clinics attracted a "young clientele," with the average patient under 40 years of age. Many of these patients exhibited signs of drug use and addiction, such as pale skin, a lack of physical coordination, disorientation, and dilated pupils.

On average, the clinics served approximately sixty patients per day, with the number of patients exceeding eighty on occasion. Staff frequently double and triple-booked patients for the same appointment slot. Because of the volume of visitors, the clinics would run out of seating in their waiting rooms, with patients sitting on the floor or on the outside street curb.

Due to the number of patients visiting each day, appointments with a physician typically lasted ten minutes. Doctors often had no time to examine each patient, but would instead "just ask how the [painkiller] medicine was, and if it was helping [the patient]." And when the physicians did provide examinations, they were perfunctory. For instance, one patient testified that a doctor offered him Roxicodone and Xanax after a ten minute examination, during which the physician briefly rubbed his hand along a scar on the patient's back.

The examination rooms were not well equipped for medical evaluation. They lacked surgical gloves, paper towels, sheets, examination table paper, and medical equipment.

Furthermore, the medical charts from these brief appointments contained "very cursory" notes. Although the charts included basic details about the patient, like blood pressure, urine test results, and prescription history, they did not indicate individualized or personalized treatment. The charts also revealed that "[t]he vast majority of people were receiving the same prescriptions in the same quantities."

The Georgetown and Dry Ridge Clinics did not take measures to keep prescriptions away from individuals who abused or diverted drugs. The Kentucky Medical Board recommended that pain management clinics conduct urine drug screens. A drug screen that tests positive for the presence of narcotics, beyond those already prescribed for a patient, suggests that the patient obtained additional prescriptions from other clinics. A totally negative drug test for a patient who was previously prescribed painkillers indicates that the patient diverted pills from that earlier prescription to other persons.

The staff at the Georgetown and Dry Ridge Clinics often failed to perform these tests because the clinics ran out of urine screen kits. On the other hand, when a patient was given a drug test and failed it, clinic staff still prescribed narcotic medication. In one instance, a physician refilled a prescription for an undercover officer whose urine test showed no controlled substances in his system, even though the officer stated he had "tak[en] pills inappropriately" and "too soon." In another instance, a husband and wife who failed their drug screens were merely given a lower dosage of painkillers. Additionally, Defendant personally made decisions to retain patients who failed their urine tests. If Defendant "didn't want somebody let go, he would say, 'No, we're going to give them another chance.'" Defendant also directed staff to doctor the results of failed drug test results.

The clinics were similarly lax about "pill counts." A pill count occurs when a patient brings his or her prescription pill bottle to the office for an inspection of the number of pills remaining in that container. The number reveals whether the patient is taking the pills properly, or whether the patient is abusing or diverting them. Clinic staff often did not perform these counts. And when pill counts took place, many patients at the Georgetown and Dry Ridge Clinics failed.

Patient records confirmed the overall lack of medical scrutiny at these clinics. The patient files lacked physician referrals, even for those patients complaining of chronic pain. And whereas most legitimate pain management doctors prescribed long-acting narcotics for chronic pain, physicians at the Georgetown and Dry Ridge Clinics prescribed multiple daily doses of short-acting narcotics, which were more commonly used to treat "break-through" pain.

Defendant's own employees criticized the standards at the Georgetown and Dry Ridge Clinics. Dr. Paul Craig, a physician who briefly worked at the Georgetown Clinic in 2011, believed that clinic staff prescribed narcotics at dosages "higher than most people would need" for non-cancerous conditions. According to him, the Georgetown Clinic operated "on the fringe" and fell "out of [his] comfort zone." Similarly, Eileen Fowler, a registered nurse who worked at the Dry Ridge Clinic, told Defendant: "This is nothing but a pill mill . . . you cannot do this." Defendant responded, "Oh, yes, I can."

Defendant exercised great influence over the medical practices of his physician employees. For instance, Dr. Alan Godofsky, a physician who worked at the Georgetown clinic between March 2011 and January 2012, complained that it was "so busy the doctors can't put in full notes and do the appropriate research." But Defendant felt Dr. Godofsky "wasn't seeing enough patients" and "was dragging his feet and slowing down his care of the patients, the time

that he was spending with the patients." Defendant told Dr. Godofsky, "If you don't give [the patients] what they want, they won't come back." As a result, Dr. Godofsky wrote 6,000 prescriptions for over 500,000 Oxycodone dosage units in under one year.

Defendant exercised an even greater degree of influence over Dr. Gregory White. Defendant hired Dr. White at the Georgetown Clinic in May 2011, but later sent him to the Dry Ridge Clinic. Dr. White saw up to ninety-two patients a day. Because Defendant felt Dr. White "wasn't working fast enough," Defendant instructed him to limit his appointments to fifteen minutes for new patients and five minutes for returning patients. Dr. White felt that he was doing his patients a "disservice" by seeing them for such short durations, but nonetheless refused to reduce his patient load because "[t]hat's not what [Defendant] wants." Moreover, Defendant created a set of prescription guidelines and imposed them on Dr. White. The guidelines set upper limits on Oxycodone and Valium dosages, as well as proscribed combinations of certain drugs. Defendant even made direct changes to patient charts to justify prescribing certain drugs, and then personally wrote out prescriptions to match the chart. Under Defendant's direction, Dr. White prescribed nearly 1.5 million dosage units of Oxycodone over a 10-month period.

Defendant had similar interactions with Dr. Lea Ann Marlow. A *locum tenen* agency placed Dr. Marlow at the Georgetown Clinic in February 2012. She assumed a permanent role two months later, working primarily at the Georgetown Clinic and occasionally at the Dry Ridge Clinic. Because she had not previously worked at a pain clinic, Dr. Marlow sought guidance about prescription practices on her first day at the clinic, but she received none. She "w[rote] more prescriptions for Oxycodone that day than [she] had in [her] prior 16 years" of practice. When Dr. Marlow switched to Hydrocodone, a less potent narcotic, patients complained to Defendant and his office manager. Her attempt at changing to Hydrocodone "lasted

approximately one month" before Dr. Marlow "changed [the patients] back to their previous dosage." Dr. Marlow deemed it "very, very plain" that Defendant would fire her if she reduced dosages, causing patients to leave. Defendant also became "very angry" when Dr. Marlow refused to see patients who did not have completed lab work or seek the referrals Dr. Marlow recommended. On one occasion, Defendant "told" Dr. Marlow to prescribe medication for a patient who Dr. Marlow believed should have instead seen a cardiologist due to an abnormal EKG. Overall, Dr. Marlow prescribed 99% of her patients the same regimen: Oxycodone, Valium, a nerve pain drug, and an anti-depressant.

Defendant profited from his businesses. Patients paid $300 in cash for an initial appointment, and then $250 for subsequent appointments. Third party individuals sometimes sponsored patients financially in exchange for medication. The clinics also referred patients to other entities owned by Defendant. For example, because the clinics required a recent MRI before treatment, staff directed patients to Bluegrass MRI, a company owned by Defendant. Bluegrass MRI charged an upfront cash payment of $450 for an MRI. And after local pharmacies stopped honoring the prescriptions issued by the two clinics, Defendant opened the Central Kentucky Family Pharmacy, where he "funneled the patients . . . so it would be easier to purchase their medication there and also make a profit [for Defendant] from it."

Bank records from 2011 and 2012 indicated that Defendant deposited over $2 million, largely in cash, in the bank accounts for the Georgetown and Dry Ridge Clinics. During that period, he deposited nearly $500,000 in the Bluegrass MRI bank account and a little over $61,000 in the Central Kentucky Family Pharmacy bank account. At the same time, millions of dollars flowed into accounts registered to Defendant and Double D Holdings, a company owned and controlled by Defendant. Defendant used this money to purchase or lease large land plots

for a residence and a farm. He also bought expensive farm equipment, two tractors, a Dodge truck, and a Marine Tahoe boat.

In November 2011, the Kentucky Office of the Inspector General began to review the prescribing practices of physicians at the Georgetown Clinic. Investigators identified several troubling trends in the Georgetown Clinic's practice: (1) the long-term use of controlled substances; (2) the use of "combinations of controlled substances favored by individuals who abuse or divert prescription drugs"; (3) a "young" patient population comprised of individuals in their 20s; (4) the distances traveled by many patients to the clinic; (5) the treatment of multiple family members with the same type of drugs; and (6) the decision to initiate most patients on high doses of potent narcotics, specifically Oxycodone. Investigators noted that the medical charts contained "cursory" information and no individualized treatment plans. Furthermore, some charts appeared altered. The Kentucky Medical Board subpoenaed the clinics' charts, conducted inspections, and interviewed several doctors. The Board ultimately suspended the licenses of two doctors, including Dr. White, and prohibited three others, including Dr. Godofsky, from prescribing controlled substances for a period of time.

In late 2011 through early 2012, the Kentucky State Police conducted its own investigation, dispatching five undercover informants to the clinics. The informants posed as patients seeking drug prescriptions, and secretly videotaped their conversations with physicians. Staff evicted one informant after discovering his camera. The other four informants successfully recorded their conversations as they obtained narcotic prescriptions.

In July 2012, Kentucky enacted a law mandating that pain clinics be owned and operated by physicians, although existing clinics could apply for an exemption if they had no history of sanctions. Because the Kentucky Medical Board's decisions eliminated the possibility of that

exemption for the Georgetown and Dry Ridge Clinics, they closed down soon after the law went into effect.

A federal grand jury indicted Defendant on two counts of conspiracy to distribute and dispense controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 846 (Counts 1-2); eight counts of aiding and abetting the distribution of controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 3-10); one count of operating his clinics for the purpose of unlawfully distributing and dispensing controlled substances, in violation of 21 U.S.C. § 856(a)(1) (Count 11); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 12); and eleven counts of money laundering, in violation of 18 U.S.C. § 1956 and § 1957 (Counts 13-23). The grand jury named Defendant's various businesses as co-defendants. Defendant pleaded not guilty and proceeded to a jury trial.

The jury convicted Defendant on all counts after an eleven-day trial. Defendant filed post-verdict motions for acquittal or, alternatively, a new trial. The district court granted acquittal on Count 10,[1] but denied Defendant's motions on all other counts. This appeal followed.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence underlying his convictions. When addressing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

---

[1] The United States conceded that acquittal on Count 10 was appropriate because Ultram, the drug identified by the count, was not a controlled substance under federal law.

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443

U.S. 307, 319 (1979).

### 1. Conspiracy (Counts 1-2)

The United States charged Defendant with two counts of conspiracy to distribute and

dispense controlled substances outside the scope of professional practice and not for a legitimate

medical purpose, in violation of 21 U.S.C. § 846. To prove a drug conspiracy, the United States

must establish "(1) an agreement to violate the drug laws, and (2) each conspirator's knowledge

of, intent to join, and participation in the conspiracy." *United States v. Crozier*, 259 F.3d 503,

517 (6th Cir. 2001). Defendant argues that the evidence failed to establish that an agreement

existed between Defendant, his corporations, or any physicians he employed to distribute

controlled substances.

Based on Defendant's influence over the schedules and prescribing practices of his

physicians, a reasonable jury could find the existence of "a tacit or material understanding

among the parties," *United States v. Avery*, 128 F.3d 966, 970-71 (6th Cir. 1997) (citation

omitted), to violate drug laws. Defendant urged his doctors to see more patients in a day than

was compatible with rendering medical care within the scope of professional practice and for a

legitimate medical purpose. For example, Defendant expressed that Dr. Godofsky "wasn't

seeing enough patients" and "was dragging his feet and slowing down his care of the patients,

the time that he was spending with the patients," even though Dr. Godofsky believed it was "so

busy the doctors can't put in full notes and do the appropriate research." Defendant even told

Dr. Godofsky that "[i]f you don't give [the patients] what they want, they won't come back."

Similarly, Defendant told Dr. White that he "wasn't working fast enough" and instructed him to

spend merely fifteen minutes with new patients and five minutes with returning patients.

Although Dr. White felt he was doing his patients a "disservice" by not spending more time with them, he ultimately refused to limit his patient load because "[t]hat's not what [Defendant] wants."

Defendant also influenced the drug quantity and type of the prescriptions issued. Dr. White prescribed painkillers based on guidelines established by Defendant. And after patients complained to Defendant that Dr. Marlow switched them from Oxycodone to less potent Hydrocodone, Dr. Marlow "changed [the patients] back to their previous dosage," because she considered it "very, very plain" that if she reduced dosages and patients left, Dr. Marlow "would be fired." Finally, Defendant doctored patient charts and wrote out prescriptions himself.

This evidence concerning Defendant's knowledge of and influence over the medical practices of his physicians implicates him in a conspiracy to illicitly prescribe prescription medication. *See, e.g.*, *United States v. Volkman*, 736 F.3d 1013, 1025 (6th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 13 (2014) (upholding conspiracy conviction where the conspirators "were aware of the reality that the prescriptions from their clinic had no legitimate medical purpose"); *United States v. Mahar*, 801 F.2d 1477, 1487-88 (6th Cir. 1986) (concluding that the owner of a pain clinic and his father "participated as coconspirators in [a] drug distribution conspiracy" where they knew of prescribing practices "outside the usual course of medical practice" because the pair "supervised and directed the activities of the Clinic's employees" and "spent considerable time in the pharmacy"). Given these facts, a jury could reasonably infer a conspiracy from Defendant's participation in a common plan within the Georgetown and Dry Ridge Clinics to distribute controlled substances outside the scope of professional practice and not for a legitimate medical purpose. *See United States v. Blakeney*, 942 F.2d 1001, 1010 (6th

Cir. 1991) (inferring a conspiracy based on evidence of a common plan to manufacture and distribute methamphetamine).

### 2. Aiding and Abetting (Counts 3-10)

The United States charged Defendant with eight counts of aiding and abetting the distribution of controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Each count addressed a date on which a confidential informant obtained a prescription. As explained above, Defendant was convicted on all counts except for Count 10.

Counts 3 and 4 encompassed Detective Tim Dials's visits to the Georgetown Clinic in 2011. At trial, Detective Dials testified that he met with a physician on August 23, who briefly touched his back and prescribed him Percocet and Valium. This testimony served as the basis of Count 3. Detective Dials stated that he then met with Dr. Godofsky on September 20, who saw Detective Dials for less than five minutes and prescribed him Oxycodone without a physical examination. Detective Dials further testified that he met with Dr. Godofsky again on October 26. Dr. Godofsky increased his Oxycodone dosage even though Detective Dials's urine tested negative for Oxycodone, and he told Dr. Godofsky he had "been taking pills inappropriately" and "too soon." This testimony formed the basis of Count 4.

Counts 5 through 8 covered visits to the Georgetown Clinic by Kimberly Preston in late 2011 and early 2012. Although Preston was unavailable as a trial witness, the United States introduced evidence in the form of medical records that corroborated her visits. Preston first visited the clinic on November 11. Her medical chart for that day mentioned only a physical examination of chest and leg strength, and her file included an MRI report that noted the absence of any serious back conditions. Nonetheless, the chart indicated that her physician still

prescribed Percocet for lower back pain. This medical chart and patient file formed the basis of Count 5. Medical records indicated that Dr. Godofsky renewed the Percocet prescription on December 15 and January 12, even though Preston's urine tested positive for marijuana. These records served as the basis of Count 6 and Count 7. The medical chart for Preston's final visit on February 14 contained no notations of any examination, but noted only a refill of that prescription. This chart served as the basis of Count 8.

Finally, Count 9 encompassed visits made by Shelaine Aydelott to the Georgetown Clinic in early 2012. Aydelott testified that she first visited the Georgetown Clinic in mid-January 2012. At that visit, a nurse informed Aydelott that she "wouldn't get . . . anything with" the MRI she provided. Aydelott returned to the clinic with a different MRI on January 25. She testified that Dr. Godofsky prescribed her Oxycodone after a twenty-minute exam. Aydelott attested that she visited the clinic again on February 22, where Dr. Marlow examined her for two or three minutes. The United States introduced the medical chart for that examination, in which Dr. Marlow wrote that Aydelott's MRI "doesn't justify [the] pain level." But Dr. Marlow still reissued the Oxycodone prescription. Aydelott's testimony and her medical chart served as the basis of Count 9.

Defendant challenges the sufficiency of the evidence underlying his aiding and abetting convictions on two grounds. First, Defendant claims that the United States presented "no evidence" that the treatment provided to these confidential informants was outside the scope of professional practice and not for a legitimate medical reason. We disagree. Based on the evidence, a reasonable jury could conclude just the opposite. Detective Dials testified that he obtained prescriptions after cursory examinations, and even after his urine test indicated that he did not take his previous prescription. Although Preston did not testify, her medical records

were admitted and stated that she obtained a prescription for lower back pain after a limited physical examination, notwithstanding an MRI report noting the absence of any serious back conditions, and that a physician refilled her script without further examination and in spite of a positive drug screen. Finally, Aydelott testified that her Oxycodone prescription was renewed after a two or three minute examination, even though the medical chart indicated that Aydelott's MRI did not correspond to her pain level.

The testimony of and records pertaining to these informants sufficiently proved that the doctors illegally issued prescriptions. *See Mahar*, 801 F.2d at 1487 (finding that "brief examinations" lasting under eight minutes per patient "permitted the jury to find that it was impossible for the Clinic to conform to the usual course of medical practice"); *United States v. Armstrong*, 550 F.3d 382, 389-90 (5th Cir. 2008) (deeming conduct outside the usual course of professional practice where the government presented evidence of, among other things, short durations for patient visits, absence of meaningful physical examination, lack of required documentation of physical injury, as well as false documentation and outdated MRIs presented by patients).

Second, Defendant claims that the United States presented scarce evidence of Defendant's involvement in any of these incidents. "To aid or abet another to commit a crime, a defendant must in some way associate himself with the venture such that his participation is intended to bring about the crime or make it succeed." *United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006) (alteration and citation omitted). As explained above, Defendant was intimately involved with the schedules and prescribing practices of his physicians. He pressured doctors to see large numbers of patients, and he ensured that patients received the drugs they wanted. *See United States v. Johnson*, 831 F.2d 124, 128-29 (6th Cir. 1987) (affirming a clinic

administrator's aiding and abetting conviction because he "was intimately involved in virtually every facet of administrating the clinic, including the hiring and firing of the doctors and staff, the recording of the receipts and the prescriptions, and the supervision of the employees who actually handed out the prescriptions and received the payments").

### 3. Money Laundering (Counts 12, 13, 15, and 17-23)

Based on the arguments detailed above, Plaintiff argues that no illegal activity occurred from which he could launder proceeds. *See United States v. Prince*, 214 F.3d 740, 747 (6th Cir. 2000) (stating that laundered funds "must be the proceeds of an unlawful activity" to satisfy the first element of money laundering). For aforementioned reasons, the evidence at trial sufficiently established Defendant's guilt for the conspiracy and aiding and abetting counts. Defendant's argument concerning the money laundering counts thus fails.

### B. Instructional Error

After the parties rested, the district court instructed the jury on the elements of each charged offense. Instruction No. 12 stated that the jury could prove a defendant's knowledge "that others were dispensing controlled substances without a legitimate medical purpose and outside the usual course of medical practice" if it was "convinced beyond a reasonable doubt that a defendant was aware of a high probability that others [were engaged in that conduct], and that a defendant deliberately closed his eyes to what was obvious." Defendant did not object to this "deliberate ignorance" instruction when read. In his motion for a new trial, however, Defendant argued that the district court improperly gave Instruction No. 12 in connection with Count 11, which charged Defendant with "knowingly and intentionally" opening and maintaining two pain clinics "for the purpose of" illegally distributing controlled substances, in violation of 21 U.S.C. § 856(a)(1). Defendant claimed that a deliberate ignorance instruction

was incompatible with proving a violation of § 856(a)(1), which required proving a *purpose* to engage in illegal drug activity.

The district court rejected Defendant's argument, reasoning that "the deliberate-ignorance instruction was not directed at the § 856(a)(1) charge because the knowledge it refers to is different than that described in Count 11." The district court held that Instruction No. 12 "was not tied to any specific count charged, but instead generally instructed the jury that—if necessary—they may find that [Defendant] had the requisite knowledge for a charge by finding him deliberately ignorant." It determined that the instruction was "not directed at *any* knowledge that *any* charge might require," but rather the type of knowledge necessary to prove that others were dispensing controlled substances without a legitimate medical purpose and outside the usual course of medical practice. Accordingly, the district court reasoned, "if a charge requires [Defendant] to have a different piece of knowledge, Instruction No. 12 by its own terms would not apply." The district court alternatively concluded that even if Instruction No. 12 was improperly given, the error was harmless because overwhelming evidence at trial indicated Defendant had actual knowledge of the practices and procedures at his two clinics.

Defendant revives his argument on appeal. We review a district court's choice of jury instructions for an abuse of discretion, *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007), examining the "instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008) (citation omitted).

To support his contention, Defendant mistakenly relies on *United States v. Chen*, 913 F.2d 183 (5th Cir. 1990). The trial court in *Chen* instructed the jury that knowledge for a § 856(a)(1) charge could be inferred from deliberate ignorance. *Id.* at 187. The Fifth Circuit

disagreed, concluding that a deliberate ignorance instruction could not be used under a plain reading of § 856(a)(1) because "[o]ne cannot be deliberately ignorant (in order to convict for the knowledge element) and still have the purpose of engaging in illegal drug activities." *Id.* at 190.

Unlike the trial court in that case, which "did not give separate instructions on the knowledge component for each [charged] offense," but rather "applied" the deliberate ignorance instruction to both counts, *id.* at 187, the district court in this case applied the deliberate ignorance instruction only to specific misconduct. By its own terms, the deliberate ignorance instruction below spoke to whether Defendant was "aware of a high probability that others were issuing controlled substances without a legitimate medical purpose and outside the usual course of medical practice" and "deliberately closed his eyes to what was obvious." Instruction No. 12 thus articulated the knowledge requirement for Counts 3 through 10, which charged Defendant with aiding and abetting the distribution and dispensation of controlled substances outside the scope of professional practice and not for a legitimate medical purpose.

In contrast, Instruction No. 19 expressly addressed the mental state for Count 11, stating that the United States had to prove that Defendant "opened and maintained one or both of the clinics *for the purpose* of manufacturing, distributing, or dispensing controlled substances outside the scope of professional practice and not for a legitimate medical purpose." Accordingly, Instruction No. 12 had no bearing on the § 856(a)(1) charge. *See United States v. Williams*, 612 F.3d 500, 507-08 (6th Cir. 2010) (holding that a deliberate ignorance instruction did not contradict a conspiracy charge instruction where the district court provided the deliberate ignorance instruction "well before the court's instruction about the elements of a criminal conspiracy," indicating that the instruction "instead explained the degree of knowledge required by [the defendant] concerning the illegality of his actions and the actions of others").

## C. Evidentiary Rulings

Defendant argues that he is entitled to a new trial because two evidentiary rulings below interfered with his right to present a defense. We review "all evidentiary rulings—including constitutional challenges to evidentiary rulings—under the abuse-of-discretion standard." *United States v. Davis*, 577 F.3d 660, 666 (6th Cir. 2009) (citation omitted).

### 1. Exclusion of Surveillance Audio

The first evidentiary ruling concerned audio-visual recordings of surveillance conducted by Detective Hector Alcala—the leader of the Kentucky Police Department's investigation—and another officer at the Georgetown and Dry Ridge Clinic parking lots. Detective Alcala and his partner sat a distance from the clinics and used a hand-held video camera to capture the cars frequenting the clinic. However, as they sat and watched, "they made comments back and forth to one another about some of the patients and some of the activities they observed there on [the] parking lots." Some of those comments were "downright nasty" and "vulgar." For instance, the officers inappropriately criticized the appearance of the patients entering and leaving the clinic.

The United States filed a motion in limine to silence the audio portion of the recordings when presenting the videos at trial. It argued that the comments by the officers were not relevant under Federal Rule of Evidence 401 because the "comments do not relate to the Defendant himself and do not have any tendency to make any fact in the [Defendant's] case more or less probable" or have "any consequence in determining the guilt or innocence of the Defendant." The district court granted the motion over Defendant's objection, holding that the "conversations between police officers regarding their own opinions of suspects and their activities are not relevant to proving facts in a criminal case and the charges here." The district court further

reasoned that if the remarks were relevant, they would be "more prejudicial than probative . . . to determining the facts of this case."

Defendant renewed his objection in his motion for a new trial, claiming that the "selective introduction of the video only . . . robbed the jury of important information striking at the least of the legitimacy of the instant prosecution." The district court again rejected Defendant's argument, concluding that "although it contained unkind statements about patrons of the clinic, the audio portion of the recording had absolutely no bearing on this case or the validity of the images captured in the video, which was used solely to identify the criminal informants as they made visits to various clinics."

The district court did not abuse its discretion in holding that the audio portion of the recordings was not relevant. The audio did not "hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence[.]" *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (citation, emphasis, and internal quotations omitted). The comments made by the agents pertained largely to their perception of the patients at the clinics—they did not implicate Defendant or speak to his guilt or innocence. *See United States v. Midyett*, 256 F.R.D. 332, 335-36 (E.D.N.Y. 2009) (holding that a portion of a video depicting an interaction between the defendant, a confidential informant, and a third person was irrelevant where the video captured a "Non-Drug Conversation" in a prosecution for the distribution of cocaine base, and where the conversation did "not relate to any of the issues being tried in the instant case").

**2. Exclusion of Preston Video**

Prior to trial, the United States and Defendant agreed to the admissibility and authenticity of certain exhibits. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or

identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). The parties referred to this agreement as the "preadmission process." One of those exhibits, marked as Government's Exhibit No. 6-E, was a CD containing surveillance video taken by Kimberly Preston during her February 14, 2012 appointment. The United States planned to introduce the video at trial, but it ultimately decided not to present the exhibit because it did not call Preston as a witness.

At the conclusion of proofs by the United States and Defendant, defense counsel asked the district court to mark that video as a defense exhibit in order to potentially "make mention in the closing argument of the fact that there were examples of patient visits which were longer in duration." Defendant posits that the preadmission process existed to formally admit exhibits, and that the Preston video entered the trial record at that point.

Insofar as this is a question concerning the admission of evidence, we review for an abuse of discretion. *See Davis*, 577 F.3d at 666. Insofar as this is a question of the district court exercising reasonable control over the presentation of evidence, we also review for an abuse of discretion. *See* Fed. R. Evid. 611(a) (stating that a district court "exercise[s] reasonable control over the mode and order of examining witnesses and presenting evidence").

We hold that the district court did not abuse its discretion for four reasons. First, Defendant did not seek to introduce this particular exhibit at trial, and he offers no explanation as to why he did not do so. Nor did Defendant request to reopen proofs to have the exhibit admitted. *See United States v. Hatchett*, 31 F.3d 1411, 1425 (7th Cir. 1994) (reopening the government's case for the purpose of admitting exhibits that were testified about but not offered into evidence at trial). While it is true that Defendant is under no obligation to produce proofs, he did admit other exhibits during trial.

It is unclear from the record whether defense counsel sought to play the full recording during closing argument, or whether counsel wanted to merely comment on the video. But in either case, closing argument is the wrong phase in which to present new evidence. During closing arguments, attorneys are confined to commenting on "properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008). *See also United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978) ("[A]n attorney may not say anything to the jury implying that evidence supporting the attorney's position exists but has not been introduced in the trial."). Additionally, statements made by attorneys in closing are not considered evidence. *Wiley v. Sowders*, 647 F.2d 642, 650 (6th Cir. 1981). Because the Preston video was not presented to the jury during trial, the United States would not have an opportunity to respond with proofs in its reply argument. Hypothetically, for example, the United States may have wanted to offer a witness to explain the meaning of the video.

Second, the district court correctly concluded that admitting the video and allowing defense counsel to mention it in his closing argument could confuse the jury because it lacked the appropriate context or background to analyze the video. *See United States v. Wilson*, 27 F.3d 1126, 1129 (6th Cir. 1994) (holding that, when the defendant's witness did not appear by the court's deadline before closing arguments, the district court did not abuse its discretion in excluding that testimony because to "allow the testimony of a witness after closing arguments would have provided defendant with, perhaps, an unfair advantage and quite possibly confuse the jury").

Third, although Defendant wanted to use the Preston video to demonstrate that at least one patient examination was longer in duration, evidence in the record already supported that

fact. During trial, defense counsel asked Detective Alcala about the length of Preston's visit, and Detective Alcala approximated that it lasted "around 25 minutes." As such, the matter of the length of Preston's visit was before the jury and could have been argued.

Fourth, as the district court emphasized, the Preston video had "not been used by either party and could have been used by the defense if the United States didn't use it[.]" Given the district court's considerable discretion concerning the admission of proofs, the district court did not err in refusing to admit the video.

Assuming Defendant was correct that the preadmission process not only verified and identified the video, but also *admitted* it into the trial record, thus resulting in error from the district court's refusal to admit the video, the error would be harmless. The same reasons demonstrating that the district court did not abuse its discretion in refusing to admit the Preston video also explain why the error is harmless. Furthermore, Defendant could have made the same argument based on Detective Alcala's testimony on cross examination. In any event, the trial testimony also revealed that the length of Preston's examination was an anomaly when compared with the length of examinations for the vast majority of patients visiting the Georgetown and Dry Ridge Clinics, who generally spent less than fifteen minutes with a doctor. Thus, admitting the video may have been more harmful than helpful by highlighting that disparity.

And Preston's medical records admitted into evidence clearly demonstrated that she obtained controlled substances outside the scope of medical practice and not for a legitimate purpose. Specifically, Preston was prescribed Percocet for lower back pain, even though her MRI report noted the absence of serious back conditions, and that Percocet prescription was refilled twice after Preston tested positive for marijuana. Consequently, whether we evaluate Defendant's claim as one of abuse of discretion or as one of error, his argument fails.

**D. Improper Rebuttal Argument**

During Defendant's closing argument, defense counsel argued that Defendant was not complicit in the illegal distribution of controlled substances because he made efforts to comply with the law by cooperating with local law enforcement. Specifically, defense counsel emphasized that Defendant "work[ed] with the Georgetown Police Department" and that the local department's "liaison" to the Georgetown Clinic was also a patient there. Counsel claimed Defendant had an "ongoing, proactive" rapport with that liaison, Detective Don Mather. Defense counsel further stressed that Defendant's clinics "reported incidents of doctor shopping," referencing a local newspaper article that quoted Defendant and Detective Mather, and cited the Georgetown Clinic's efforts at combatting "doctor shopping." Counsel then asked the jury how the United States could prosecute "an individual of facilitating . . . doctor shopping, with objective proof that the individual worked with the police to fight and combat that very kind of offense[.]" Defense counsel concluded that the charges "can't be reconciled with the undisputed proof of [Defendant's] efforts to help law enforcement fight diversion."

During the rebuttal, the prosecutor acknowledged that Defendant had a close relationship with Georgetown police. To that end, the prosecutor told the jury that they would be able to see Detective Mather's medical chart, which indicated that he made several visits to the clinic, as well as bank records showing a $100 check to the clinic from him. However, the prosecutor characterized this relationship as problematic because it facilitated local police bias.

In support, the prosecutor recounted the testimony of confidential informant Christopher Rigney to illustrate this bias. Rigney testified that when he attempted to infiltrate the Georgetown Clinic, staff discovered his camera and prevented him from leaving. Rigney contacted the Kentucky State Police, who supervised him, to tell them that he was in trouble.

Rigney escaped from the clinic and made his way to a nearby gas station, where he rendezvoused with Kentucky State Police officers. However, a group of Georgetown Police officers approached Rigney, and a local sheriff asked the state officers if Rigney was their "snitch." The sheriff then told Rigney that he "needed to get out of town and not come back."

The prosecutor also described the testimony of Detective Tim Dials of the Kentucky State Police, one of the informants who infiltrated the Georgetown Clinic. Detective Dials testified that when conducting a federal investigation, officers did not usually consult local law enforcement because "[m]any times, some of the local people may have friends there who may say something." The prosecutor suggested that Defendant may well have "influenced" Detective Mather and that "the investigation at that point could have been very damaged." The prosecutor also noted that local law enforcement did not pursue any of the referrals of doctor shoppers made by Defendant, further undercutting the argument that Defendant meaningfully assisted law enforcement in quelling illegal activity.

Defendant did not contemporaneously object to the prosecutor's remarks. However, in his motion for a new trial, Defendant claimed that the United States' rebuttal argument was improper because it referenced facts not in evidence to rebut Defendant's central claim. Specifically, Defendant pointed to the statement that Detective Mather had visited the clinics as a patient on a number of occasions and paid for care once as having "zero" evidentiary support in the record. Defendant argued that the implication of this statement was "plainly that the cooperation between [Defendant] and law enforcement—a key defense in this case—was merely a ruse."

The district court rejected this argument. It emphasized that Detective Dials testified that federal law enforcement did not want to involve local police in its investigation of the clinics for

fear that it might be compromised, and the United States presented evidence that Detective Mather was a patient at the clinic to illustrate the basis of the investigators' fears. The district court also stated that Defendant put forward evidence, including a newspaper article, in which Defendant expressed his efforts to apprehend doctor shoppers. The court concluded that the "jury members were then left to draw their own conclusions regarding the legitimacy of [Defendant's] attempts to prevent pill-shopping, and the statements by the prosecutor during rebuttal were not improper." Finally, the district court noted that it specifically instructed the jury that arguments and statements by the lawyers are not evidence, and that Defendant failed to object at the time of the prosecutor's remarks.

On appeal, Defendant argues that the United States had "no evidence to support th[e] insinuation beyond the barest wisps of innuendo" that Defendant corrupted Detective Mather. Defendant further asserts that the evidence did not support the prosecutor's remark that local authorities declined to pursue Defendant's referrals of doctor shoppers. Because Defendant did not contemporaneously object to the United States' rebuttal, we review for plain error. *See United States v. Sills*, 662 F.3d 415, 417 (6th Cir. 2011).

The district court did not clearly err in permitting the prosecutor's remarks. Based on testimony in the record, the prosecutor created the inference that Defendant "influenced" Detective Mather and that "the investigation . . . could have been very damaged" by their relationship. When viewed in light of Detective Dials's testimony indicating that investigators often bypassed local police to avoid jeopardizing an investigation, as well as Rigney's testimony about how local police confronted him after he infiltrated the Georgetown Clinic, Detective Mather's visits to the Georgetown Clinic suggested provincial favoritism towards Defendant. Similarly, the prosecutor based his remarks concerning the lack of prosecutions for Defendant's

referrals on evidence in the record. Several witnesses testified that Defendant called local authorities when he suspected patients of diverting drugs, but the local police made no arrests, and authorities indicated they "would not want to prosecute" anyone who was not a repeat offender. As such, because the prosecutor's statements were not improper, we need not address whether the remarks were flagrant and warranted reversal. *See United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001) (analyzing prosecutor's statements for flagrancy after determining that the remarks were improper).

## E. Cumulative Error

Defendant lastly alleges cumulative error even if no trial error individually required reversal. "Where, as here, no individual ruling has been shown to be erroneous, there is no 'error' to consider, and the cumulative error doctrine does not warrant reversal." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012).

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.