In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 19-1602, 19-1604 & 19-1605

ANDREW J. DOLLARD, *et al.*,

*Plaintiffs-Appellants*,

*v.*

GARY WHISENAND, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
Nos. 16-cv-01721 & 16-cv-01908 — **Richard L. Young**, *Judge*.

ARGUED NOVEMBER 5, 2019 — DECIDED DECEMBER 23, 2019

Before FLAUM, ROVNER, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. In 2013, the Drug Enforcement Administration (DEA) began investigating Dr. Larry Ley and his opioid addiction treatment company, Drug Opiate Recovery Network, Inc. (DORN), for dealing a controlled substance. After conducting undercover surveillance, lead agent Gary Whisenand decided Dr. Ley did not have a legitimate medical purpose in prescribing Suboxone, a drug used to treat opioid addiction.

After finding probable cause, two Indiana courts issued a series of warrants that culminated in twelve separate arrests of five medical providers (four physicians and one nurse) and seven non-provider DORN employees. In the ensuing prosecution, the Indiana courts quickly dismissed the charges against all the non-providers and the nurse. The State eventually proceeded to a bench trial against Dr. Ley, where an Indiana court ultimately acquitted him. Following this acquittal, the State dismissed the rest of the charges against the three remaining providers.

Together, DORN's providers and non-provider employees sued the DEA agent and others in federal court alleging false arrest, malicious prosecution, and civil conspiracy. The district court entered summary judgment for the defendants on all claims, holding probable cause supported the warrants used to arrest the plaintiffs. We affirm the district court's judgment as to every plaintiff except Joseph Mackey. With respect to Mackey, we reverse and remand the judgment because the undisputed facts at the summary judgment stage do not establish that officers had probable cause to arrest Mackey or even that reasonable officers could believe probable cause existed.

## I. Background

Larry Ley graduated from medical school in 1971 and has worked in a variety of medical positions across central Indiana since. He is board-certified in addiction medicine by the American Society of Addiction Medicine. In 2002, he founded Living Life, an alcohol abuse treatment company. Dr. Ley ran Living Life out of four offices in central Indiana: Centerville, Noblesville, Muncie, and Kokomo.

### A. DORN

Shortly after starting Living Life, Dr. Ley began prescribing Suboxone, a drug commonly used to treat opioid addictions. In 2007, Dr. Ley expanded his practice and renamed it "DORN." He opened a new office in Carmel, and continued operations at the four existing satellite offices. Dr. Ley saw all his patients for their initial consultations at the Carmel location. He primarily worked out of that office, but he also spent time in Noblesville and Muncie.[1]

For follow-up appointments, patients went to the office closest to their homes. Other physicians staffed these satellite offices, including Dr. Ronald Vierk in Centerville, Dr. Luella Bangura in Kokomo, and Dr. George Agapios in Carmel. Yvonne Morgan is a registered nurse who directed the Centerville clinic and assisted the Muncie and Carmel clinics. She completed mostly clerical tasks for DORN, like answering the phone, conducting drug screens, and handing patients their prescriptions.

Several non-provider employees worked at the DORN clinics, too:

- Derek Tislow was a part-time office assistant in Noblesville.

- Eric Ley—Dr. Ley's son—was a part-time office assistant in Carmel and Kokomo.

- Felicia Reid was a receptionist in Carmel.

---

[1] The Carmel clinic had a conference room and Dr. Ley's office, but no examination room and no medical equipment.

- • Joseph Mackey was a part-time parking lot attendant in Kokomo.

- • Jessica Callahan was the part-time office manager in Muncie.

- • Cassy Bratcher was the Carmel office manager.

- • Andrew Dollard is an attorney and was the part-time Noblesville office manager.

### B.  Controlled Substance Laws

Indiana, like all other states, criminalizes dealing a controlled substance. Ind. Code § 35-48-4-2. Under state law, any "person who: (1) knowingly or intentionally … (C) delivers; or (D) finances the delivery of; a controlled substance … classified in schedule I, II, or III … commits dealing …, a level 6 felony." *Id.* Buprenorphine, the primary drug component in Suboxone, is a Schedule III controlled substance. Indiana additionally proscribes conspiracies, *id.* § 35-41-5-2, and corrupt business influence, *id.* § 35-45-6-2.

Medical practitioners may prescribe controlled substances, such as buprenorphine, but their authority is limited: They must have a legitimate medical purpose to issue a reasonable quantity in the usual course of business. 856 Ind. Admin. Code 2-6-3(a). Those who prescribe controlled substances outside the scope of their practice or without a legitimate purpose are subject to sanction under Indiana criminal law. *Id.*; *see also Alarcon v. State*, 573 N.E.2d 477, 480 (Ind. Ct. App. 1991) (holding Indiana's controlled substance laws apply to licensed physicians who issue invalid prescriptions).

Furthermore, medical doctors may not prescribe controlled substances to a person whom they have never physically examined in person and diagnosed, unless it is a cross-coverage situation (or another exception applies) where multiple professionals may see a patient during her treatment by a practice group. 844 Ind. Admin. Code 5-4-1(a). Doctors must also ordinarily sign and date prescriptions on the day they issue them. 856 Ind. Admin. Code 2-6-4(a). To be sure, a secretary (or another authorized agent) may prepare and communicate prescriptions, leaving the practitioner responsible — indeed, liable — if the prescription does not conform to law or regulation. *Id.* 2-6-4(b); *Id.* 2-6-2(b); *see also* Ind. Code § 16-42-19-20(b). That is, unless the secretary (or other agent) knows the prescription is invalid; then they could be culpable too. 856 Ind. Admin. Code 2-6-3(a).

The United States also regulates a physician's ability to prescribe controlled substances. Specifically, the Drug Addiction Treatment Act of 2000 (DATA) caps the number of patients a physician may treat with buprenorphine for addiction. *See generally* 21 U.S.C. § 823(g)(2)(B)(iii). In the beginning, newly certified providers may treat thirty patients; after one year, providers may treat up to 100 patients. *Id.* If a practitioner meets certain requirements, the number is 275. *Id.* § 823(g)(2)(B)(iii)(II)(dd). This maximum number of patients, however, only applies in the addiction context, meaning those receiving treatment for an off-label use, like pain, do not count toward the 100. *See id.* § 823(g)(1).

### C. Investigation

In 2013, the Madison County Deputy Coroner contacted Officer Aaron Dietz of the Carmel Police Department to discuss the death of one of Dr. Ley's former patients.[2] Officer Dietz put the Deputy Coroner in touch with a sergeant, Marc Klein, who learned that the deceased's family expressed concerns about the care Dr. Ley once provided to the deceased. The Deputy Coroner also reached out to Adam Deitz, the director of the Hamilton and Boone County Drug Task Force, regarding the death.

Both officers began investigating Dr. Ley and DORN based on this information, leading to an interview with the deceased's family. In the interview, the family explained that Dr. Ley treated the deceased for addiction over six years. They identified the following concerns they had with Dr. Ley's medical care: The deceased rarely went into the doctor's office; Dr. Ley was not personally seeing him; other family members would pick up prescriptions for him; and he always paid in cash.

Around this time, the DEA began receiving complaints about DORN, which focused on the lack of medical care at the clinics and the ease with which patients could procure prescriptions for Suboxone without being seen by a physician.

---

[2] Officer Dietz—a Carmel Police Department Officer and Director of the Hamilton/Boone County Drug Task Force—was the local point of contact for the ensuing federal investigation. Although Officer Dietz is a defendant in this lawsuit, his personal involvement does not end up being germane to our disposition on appeal. *See infra* Part II-D.

Based on these complaints and the interview with the deceased's family, the DEA opened an investigation into Dr. Ley and DORN, which was assigned to Agent Gary Whisenand.

Agent Whisenand began his inquiry by looking into past complaints about DORN from practitioners, pharmacists, and former patients.[3] Most of the complaints criticized Dr. Ley and DORN for not providing any medical treatment to their patients and simply handing out prescriptions for Suboxone. The principal concern was that Dr. Ley was admitting people into his program without first conducting a full medical evaluation. The accusations related not only to Dr. Ley but also to DORN's satellite offices and other practitioners.[4]

These complaints led Agent Whisenand to research DORN on INSPECT, an online database that allows law enforcement to monitor controlled substance prescriptions. The data showed that each DORN physician issued a high number of Suboxone prescriptions in 2011, 2012, and 2013.[5] Agent Whisenand consequently interviewed patients and surveilled all four DORN offices. One then-current DORN patient described the Kokomo clinic parking lot as a place where people conducted drug deals and talked about how they planned to sell their medications. The patient also noted how no doctors

---

[3] Some of DORN's competitors submitted complaints. Former patients included those who had dropped out or been kicked out of the program.

[4] There were eight regulatory inspections of DORN clinics before the arrests in this case.

[5] For instance, in 2012 and 2013, Dr. Agapios wrote Suboxone prescriptions for over 680 and 750 patients, respectively.

saw any addicts; instead, patients obtained pre-signed pre-scriptions from the front desk. DEA surveillance confirmed that no doctors administered any physical exams at the clinics.

### D. Undercover Agents and Experts

The state prosecutor assigned to the investigation, Andre Miksha, recommended Agent Whisenand enlist undercover officers to provide a firsthand account from the insides of the clinics. On March 25, 2014, two DEA special agents posed as new patients at the Carmel clinic. Cassy Bratcher, the office manager, greeted the agents and instructed them to fill out some paperwork.[6] She then showed the agents into a conference room where they met with Dr. Ley and discussed addiction treatment for about one hour.

Then, for another hour, Dr. Ley questioned the prospective patients about what types of drugs they were taking, in what doses, and whether they had any conditions causing pain. At the end of the second hour, Dr. Ley prescribed Suboxone for "chronic pain/pain management" and directed the agents to the front to pick up their prescriptions. DORN ultimately charged the agents a $300 program fee at their initial sessions. Dr. Ley gave them the contact number for "Andrew" and assigned the agents to the Noblesville office for all future appointments.

---

[6] The agents, like all DORN patients, had to sign a pledge to take the prescribed medication only in the dosage and on the "taper schedule" set by the program. They also agreed to consume no other narcotics. No agent ever reported that a DORN doctor increased their prescription upon request.

The use of undercover agents for initial visits continued at the Carmel clinic, following the pattern set by the first: Dr. Ley led a two-hour group discussion; he did not conduct a physical or meet with any patient one-on-one; and each patient left the clinic with a prescription of Suboxone after paying a $300 program fee.[7] Each of the agents' prescriptions (and corresponding taper schedules) were different and individualized to them, based on their reported drug histories.

The undercover agents reported to the various clinics for their follow-up appointments and corroborated many of their earlier findings: The appointments generally lasted a few minutes; the agents received their Suboxone prescriptions without a doctor assessing them (they submitted to urine screening[8]); and many prescriptions were pre-signed because there was often no doctor present at the facility.[9] On the prescriptions, the reasons for additional medication often changed without explanation; so, one agent received a Suboxone prescription for "dependency" even though his initial prescription was for "pain management."

---

[7] This price never changed, regardless of the number of appointments or the amount of medication prescribed. As a general matter, it cost $300 to enter the program at the initial session, and then it was $40 per week thereafter. The weekly charge covered all the program's services, meaning there were no separate DORN fees for prescriptions, in-person appointments, or telephone consultations.

[8] DORN expelled many patients for failed drug screens, including Undercover Officer Richardson, because his two previous urine drug screens tested negative for Suboxone. DORN booted another undercover agent, Officer Katt, because he refused a drug screen.

[9] At follow-up appointments, receptionists and office assistants often did not request identification or medical records from patients.

The DEA retained two medical doctors to opine on Dr. Ley and DORN. First, Dr. Tim E. King, a pain expert and practicing anesthesiologist, stated that it was unrealistic for a physician to treat 80–100 patients in a three-hour period and highly unconventional to assume that one person could perform an initial pain or addiction evaluation (not in any actual examination room) and then assign the patient to another provider for exclusive treatment. Dr. King felt like Dr. Ley was running DORN as a "pill mill" because Dr. King thought Dr. Ley was not issuing prescriptions for controlled substances in the usual course of practice or for a legitimate medical purpose.

Second, Dr. R. Andrew Chambers, an associate professor of psychiatry at Indiana University School of Medicine and a practicing addiction treatment doctor, echoed Dr. King. Dr. Chambers believed it was unusual for Dr. Ley to care for that many patients in that short of time. Dr. Chambers, like Dr. King, found it abnormal for one doctor to conduct an initial examination and then "farm out" the subsequent ones. Dr. Chambers ultimately shared Dr. King's conclusion that DORN was an illegal dealing operation and the physicians involved "conspired to use their professional authorities and reputations, and the cover of medical practice an authority to maximize financial gains at the expense of clinical standards."[10]

---

[10] The investigation did not find any DORN patient who was not actually an addict, making these individuals otherwise eligible for medical care. Similarly, it found that no DORN patient was ever hospitalized or treated for an overdose. The DEA determined that DORN never prescribed anything more than a therapeutic dose of Suboxone to its patients.

### E. Probable Cause Affidavit and Arrests

Agent Whisenand prepared a probable cause affidavit to support the arrests of all DORN staff and the search and seizure of certain property.[11] Relevant here, the allegations against the non-provider employees[12] were:

- Two undercover agents and one former patient received suspected pre-signed prescriptions (suspected because the patients did not observe doctors on the premises) for continued treatment from Jessica Callahan at the Muncie office on at least three separate occasions. Two investigators surveilled Callahan at the Muncie office two other times.

- Investigators surveilled Eric Ley or his vehicle at the Carmel and Kokomo offices eight different times. They also observed him printing prescriptions for

---

[11] Dietz did not participate in the drafting of the affidavit; in fact, he only read it after it was submitted to the courts.

[12] We are not going to exhaustively restate the contents of the probable cause affidavit in this opinion. Instead, we include the allegations against the non-provider employees because it is those that will ultimately be most relevant to our analysis. We do, however, think it is important to include the accusations against one provider, Yvonne Morgan, and we do so below:

Investigators believed Yvonne Morgan (or another employee), a registered nurse, issued pre-signed prescriptions at the Centerville and Muncie offices seven different times. They additionally observed her at the Muncie office on two other occasions. The officers learned Morgan operated a 2012 Ford Edge. One undercover agent received her phone number because she was supposedly the Centerville office point-of-contact; another agent was given her and Jessica Callahan's names as the Muncie office leads.

Dr. Agapios to sign in person those days, without first seeing the actual patients on four separate occasions. The officers confirmed Ley resided with his father, Dr. Larry Ley, in Noblesville.

• Investigators and agents observed Felicia Reid or her vehicle at the Kokomo office four times. In one instance, an undercover agent received a Suboxone prescription from Reid signed by Dr. Bangura, who was in the office but did not meet with the agent. Reid also answered DORN's phone when an investigator called on one occasion.

• Investigators and agents observed Joseph Mackey at the Kokomo office five times. The officers generally saw Mackey walk in and out of the office with a clipboard, taking people's names down and arranging them outside, and interacting with vehicles in the parking lot.

• Investigators surveilled Derek Tislow entering the Noblesville office on five separate occasions. They also observed him attend a business meeting with Andrew Dollard at a local restaurant. One undercover agent met with him for a drug screen in the clinic. The agents referred to him as the "office assistant," although he called himself the assistant office manager on his LinkedIn page. Tislow took $80 from the agents five times and told them that their prescriptions would be phoned in later that day. During these encounters, the undercover agents observed multiple prescriptions on his desk. Separately, two agents received pre-signed prescriptions from Tislow for "chronic pain and secondary opiate dependency" in exchange for $160 cash.

The agents reported that Tislow had to sort through multiple prescriptions to find the correct ones, and in fact, one agent observed Dr. Ley hand several pre-signed prescriptions to Tislow, including the one he eventually left with, before ever meeting with any patient.

• Surveillance teams observed Cassy Bratcher at the Carmel and Kokomo offices meeting with patients and speaking with people many times (even making a bank deposit once), regardless of whether there were providers onsite or not. The investigators described Bratcher as the Carmel office manager and Dr. Ley described her as the point-of-contact for both the Carmel and Kokomo clinics. One time, she interrupted a meeting between Dr. Ley and an undercover agent so Dr. Ley could sign prescriptions for people he did not see while he was in the meeting. On two other occasions, Bratcher handed prescriptions to agents even though the physician never met with the agents. Undercover agents also observed her print prescriptions for Dr. Agapios to sign and give to the agents on three other dates. In one instance, Bratcher informed an agent he had to take a drug screen, and in another, she told the agent that he had to exit the program because his screens showed no buprenorphine in his system.

• Former patients stated that they would pay Andrew Dollard, Dr. Ley's attorney and the Noblesville office director, $80 in return for Dollard filling out and handing the patient a pre-signed prescription when no doctor was present. Investigators surveilled Dollard entering the Noblesville clinic on five dates; they also

observed him at his law office and two restaurants, one of which was for a business meeting in which he pitched a potential DORN expansion to an unidentified male. The undercover agents eventually learned where Dollard lived and that he was the Noblesville point-of-contact. In four instances, Dollard called in prescriptions for undercover agents; on three days he was observed in the Noblesville clinic and on one day he was not.

After examining these accusations and all others contained in the affidavit, state prosecutors agreed with Agent Whisenand that the affidavit supported probable cause to charge *all* DORN employees.[13] The lead prosecutor charged the non-provider employees because of their business roles and his belief that it would have been obvious to them under the circumstances that they were engaged in an illegal practice. Two state courts reviewed the affidavit and found probable cause existed to charge all DORN employees with conspiracy to commit dealing in a controlled substance and corrupt business influence. Police officers arrested the DORN employees on July 24, 2014.

### F. Indiana's Criminal Prosecution of DORN

Early on in their criminal cases, each then-defendant (now plaintiff) moved to dismiss the charges against them, arguing that the evidence was insufficient as a matter of law to support

---

[13] Federal prosecutors had already declined prosecution because they believed there was not probable cause to arrest and prosecute the DORN employees, at least under federal controlled substance laws.

any potential convictions.[14] One state court granted the non-providers' motions. At the same time, that court denied the providers' motions to dismiss (except for Yvonne Morgan). Another state court granted Morgan's (the nurse and point-of-contact for Centerville and Muncie) motion, although a state appellate court ultimately reversed that judgment. *State v. Y.M.*, 60 N.E.3d 1121, 1128 (Ind. Ct. App. 2016).

The State eventually proceeded to a bench trial against Dr. Ley. After denying Dr. Ley's motion based on the insufficiency of the evidence, the court ultimately acquitted Dr. Ley of all charges. The court found that the State had not proved a knowing and intentional violation of a standard of professional conduct. It followed, then, that the State did not prove beyond a reasonable doubt that Dr. Ley issued the prescriptions outside the usual course of professional medical practice. After Dr. Ley's acquittal, the State dismissed the charges against the remaining DORN doctors.

### G. This Federal Civil Rights Case

All the DORN employees then sued the lead investigator, Agent Whisenand, and other defendants in federal court, claiming they violated their constitutional rights by conspiring to falsely arrest and maliciously prosecute them. The district court granted the defendants' motion for summary judgment, holding that law enforcement had probable cause to arrest and charge all twelve DORN employees under Indiana law. Even in the absence of probable cause, the district court

---

[14] We intentionally use the plural noun, "cases," because the State charged the then-defendants in the counties where their alleged criminal conduct occurred.

reasoned, the defendants had "arguable probable cause," entitling them to qualified immunity.

This appeal followed.

## II. Discussion

We review the district court's entry of summary judgment de novo, looking at the record in the light most favorable to the non-moving plaintiffs and construing all reasonable inferences from the evidence in their favor. *See Martin v. Marinez*, 934 F.3d 594, 597 (7th Cir. 2019). Summary judgment is appropriate when there are no genuine disputes of material fact, entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a).

"Factual disputes are genuine 'only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented,' and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010)).

On appeal, the DORN plaintiffs argue that probable cause did not exist to arrest them. Additionally, they assert that arguable probable cause did not support the warrants either, meaning qualified immunity does not shield the defendants from suit. The lead DEA investigator and other defendants contend that there was probable cause to support criminal charges against the DORN employees, and even if there was not, they had an objectively reasonable basis to believe there was probable cause, which entitles them to qualified immunity. We address each issue in turn.

### A. False Arrest

"Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." *Muhammad v. Pearson*, 900 F.3d 898, 907 (7th Cir. 2018) (citation omitted). "Probable cause exists to arrest a suspect if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) (citation omitted).

When a judge authorizes an arrest, as one did here, "we presume the validity of [the] warrant and the information offered to support it." *Id.* (citation and internal quotation marks omitted). The presumption must give way, however, "if the warrant application was 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1060 (7th Cir. 2018) (quoting *Junkert v. Massey*, 610 F.3d 364, 369 (7th Cir. 2010) (quoting *Malley v. Briggs*, 475 U.S. 335, 345 (1986))). "Under these circumstances, even a facially valid arrest warrant does not shield otherwise unreasonable conduct." *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013) (citation omitted).

"An officer faces personal liability only if 'courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand' or if 'the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Edwards*, 907 F.3d at 1060 (quoting *United*

*States v. Koerth*, 312 F.3d 862, 870 (7th Cir. 2002)); *see also Brunson v. Murray*, 843 F.3d 698, 709 (7th Cir. 2016).

### B. Probable Cause

We agree with the district court's conclusion that the affidavit established probable cause to arrest the DORN plaintiffs with a few notable exceptions. It is undisputed that one of Dr. Ley's former patients died and that individual's family expressed concerns about Dr. Ley's prior treatment of him. Other doctors voiced their worries, too, accusing Dr. Ley of prescribing Suboxone for pain to avoid the 100-patient limit and ultimately bring in more revenue.

At least one pharmacy refused to fill prescriptions for DORN, and several former patients reported that they received their prescriptions without undergoing any type of physical exam. INSPECT records showed that DORN physicians prescribed an unusually high amount of Suboxone and accordingly made a substantial income. Two expert doctors, retained by the DEA, opined that the DORN physicians were not prescribing Suboxone for a legitimate medical purpose in the usual course of medical practice.

The investigators' surveillance and undercover recordings corroborate many of those observations. Dr. Ley saw prospective patients for an initial consultation in a conference room for two hours. At the end of that meeting, the patients would receive a Suboxone prescription after paying $300. Dr. Ley did not conduct any physical examinations and all patients paid for their prescriptions in cash. At many follow-up appointments, patients received their prescriptions without ever being seen by a doctor. Some of those appointments lasted just a few minutes. At times, DORN's non-provider employees

handed out prescriptions when no provider was present. In fact, the providers pre-signed a lot of those prescriptions.

Considering the totality of the circumstances, a reasonable officer could believe that most DORN employees were conspiring to deal in a controlled substance because they were knowingly issuing invalid Suboxone prescriptions; in other words, they were prescribing a controlled substance without a legitimate medical purpose and outside the usual course of medical practice. Most of the DORN plaintiffs' points to the contrary are unavailing. We will begin with the medical providers and end with the nonmedical providers.

### 1. *Medical Providers*

*First*, the medical providers maintain that Agent Whisenand should have identified and evaluated exculpatory evidence in his probable cause affidavit, namely, whether the physicians had a legitimate medical purpose in prescribing Suboxone. The plaintiffs insist that: DORN patients filled out medical histories; addiction treatment does not necessarily entail physical examination; each patient received an appropriate dose of Suboxone and corresponding tapering schedules; and all patients—including the undercover agents—signed paperwork promising to attend counseling. This evidence, the district court reasoned, went toward their defense but did not defeat probable cause. *See Alarcon*, 573 N.E.2d at 480 ("[T]he writing of a valid prescription by a licensed physician is an absolute defense to a charge of dealing in a controlled substance.").

Plaintiffs' argument confuses the matter somewhat. The use of a valid prescription as a defense to possessing—or here,

dealing—a controlled substance is a type of affirmative defense, while a defense that the intent element is lacking is not. Using the terminology of Professors LaFave and Robinson, a prescription's validity is an "offense modification defense," not a "failure of proof defense." Wayne R. LaFave, Subst. Crim. L. § 9.1(a)(1)–(2) (3d ed. 2000); *see also* Paul H. Robinson, Crim. L. Def. § 23 (1st ed. 1984) (explaining that an offense modification defense means that "while the actor has apparently satisfied all elements of the offense charged, he has not in fact caused the harm or evil sought to be prevented by the statute defining the offense," and identifying as a "typical … offense modification[] … the use of a valid prescription as a defense to possessing a controlled substance").

The distinction is meaningful in the probable cause context. On the one hand, an officer "'may not ignore conclusively established evidence of the existence of an affirmative defense,' [but] the Fourth Amendment imposes no duty to investigate whether a defense is valid." *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) (quoting *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004)). On the other hand, although a police officer must have "some evidence" on an intent element to demonstrate probable cause, *BeVier v. Hucal*, 806 F.2d 123, 126 (7th Cir. 1986), an officer need not have "the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Hawkins v. Mitchell*, 756 F.3d 983, 994–95 (7th Cir. 2014) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972).

Viewing a prescription's validity as an affirmative defense, which the district court appropriately did, we cannot say that the plaintiffs' proffered evidence "conclusively established" the affirmative defense. *McBride*, 576 F.3d at 707. Even

if it did, "there is a meaningful distinction between *disregard-ing* potentially exculpatory information and *disbelieving* it." *Mahnke v. Garrigan*, 428 F. App'x 630, 635 (7th Cir. 2011). Most importantly, the district court did not exclude the evidence from its probable cause analysis; instead, it decided that law enforcement still showed probable cause existed based on a host of other facts.

In total, Dr. Ley was prescribing Suboxone without ad-ministering physical examinations; all DORN physicians were prescribing a usual amount of Suboxone in return for quite a lot of money; and patients received many pre-signed prescriptions without seeing doctors at follow-up appoint-ments. The officers therefore had enough information to rea-sonably suspect that the DORN physicians were either issu-ing prescriptions without a legitimate purpose *or* outside the usual course of professional practice.[15] *See United States v. Chaney*, 921 F.3d 572, 591 (6th Cir. 2019) ("Evidence of the cir-cumstances surrounding a prescription allows juries to infer that a physician's purpose was something other than legiti-mate medical treatment."), *cert. denied*, 140 S. Ct. 301 (2019), *and cert. denied*, 140 S. Ct. 271 (2019).

This evidence accords with our and our sister circuits' case law concerning other "pill mill" prosecutions of physicians for dealing controlled substances. *See United States v.*

---

[15] It is incorrect for the plaintiffs to claim that this conclusion means that every doctor who writes a prescription for a controlled substance is vulnerable to lawful arrest and prosecution. Quite the contrary, only a doctor who writes prescriptions in such unorthodox and inappropriate circumstances opens themselves up to criminal liability. *See United States v. Kohli*, 847 F.3d 483, 491 (7th Cir. 2017), *reh'g and suggestion for reh'g en banc denied* (Mar. 27, 2017), *cert. denied*, 138 S. Ct. 204 (2017).

*Pellmann*, 668 F.3d 918, 924–25 (7th Cir. 2012); *Gatzimos v. Garrett*, 431 F. App'x 497, 501–02 (7th Cir. 2011); *United States v. Joseph*, 709 F.3d 1082, 1099, 1102 (11th Cir. 2013); *see also United States v. Garrison*, 888 F.3d 1057, 1064–65 (9th Cir. 2018); *United States v. Evans*, 892 F.3d 692, 706–07 (5th Cir. 2018), *as revised* (July 6, 2018); *United States v. Oti*, 872 F.3d 678, 688–89, 698 (5th Cir. 2017), *cert. denied sub nom. Iwuoha v. United States*, 138 S. Ct. 1988 (2018), *and cert. denied sub nom. Okechuku v. United States*, 138 S. Ct. 1990 (2018); *United States v. Elliott*, 876 F.3d 855, 865–66 (6th Cir. 2017), *cert. denied sub nom. Frial-Carrasco v. United States*, 138 S. Ct. 1314 (2018); *United States v. Votrobek*, 847 F.3d 1335, 1342–43 (11th Cir. 2017); *United States v. Azmat*, 805 F.3d 1018, 1035–36 (11th Cir. 2015).

*Second*, the plaintiffs contend that the follow-up clinic visits either met or exceeded established medical standards. Assuming for the sake of argument that they are correct, this evidence still goes to their prescription validity defense, and does nothing to change the fact that probable cause exists independent of the follow-up appointments. Granted, an exception is just as much a part of a statute as the rule itself is. Agent Whisenand should not have omitted the statutory exception to the physical exam rule for cross-coverage situations from the probable cause affidavit. But that error is harmless here because many patients received pre-signed prescriptions without a doctor ever being present. The DORN plaintiffs do not address this point.

What is more, taking the plaintiffs at their word, all the propriety of the follow-up visits means is that the doctors were operating within the usual course of professional practice. Agent Whisenand and his team could still have reasona-

bly believed that the physicians were not issuing the Suboxone prescriptions for a legitimate medical purpose because of the number of pre-signed prescriptions. Again, this is par for the course under the controlled substance laws. *See Joseph*, 709 F.3d at 1102 (holding evidence of providing pre-signed and pre-dated prescriptions is sufficient to support federal criminal convictions under Controlled Substances Act); *Chaney*, 921 F.3d at 578, 592; *Garrison*, 888 F.3d at 1061, 1064–65; *Evans*, 892 F.3d at 698; *United States v. DeLia*, 906 F.3d 1212, 1215 (10th Cir. 2018) ("While at the clinic, investigators confiscated 5,625 blank pre-signed prescriptions and a sign-out log showing that the clinic's staff had already used 4,330 pre-signed prescriptions between March 1, 2010 and November 3, 2010.").

Just as one might expect a reasonable doctor to have a gauge on prescription authority, so too with a registered nurse. Like her physician counterparts, the DEA could have reasonably thought that Yvonne Morgan knew that it was unlawful to distribute pre-signed prescriptions. *See Joseph*, 709 F.3d at 1091, 1102 (recounting expert testimony that "a reasonable doctor and physician's assistant would know that it is unlawful to distribute pre-signed prescriptions."); *United States v. King*, 898 F.3d 797, 803, 806 (8th Cir. 2018) (observing in another pill mill prosecution that clinical nurses had direct knowledge of standard operating procedures, including its reliance on pre-signed prescriptions); *United States v. Singleton*, 626 F. App'x 589, 592 (6th Cir. 2015) (stating that a nurse accused the defendant doctor of running a pill mill and telling him that he "cannot do this"); *United States v. Guzman*, 571 F. App'x 356, 363 (6th Cir. 2014) (noting that physicians tried to modify the prescribing practices of a nurse practitioner who consequently quit). Indeed, that is exactly what Agent

Whisenand testified to. When questioned why a nonphysician would know that something was amiss at DORN, Agent Whisenand specifically brought up Morgan but neglected to explain why any of the other support staff would have known.

That conclusion also mirrors the Indiana appellate court's finding in the State's appeal in her criminal case. *See Y.M.*, 60 N.E.3d at 1127 (reasoning that "a person of ordinary intelligence would easily understand that agreeing with or assisting a physician to distribute prescriptions for controlled substances—prescriptions that person knows to be invalid—is proscribed conduct."). The probable cause affidavit was accordingly on solid ground as applied to the providers.

### 2. *Non-provider Employees*

Ending with the non-provider employees, the probable cause affidavit tells a different story about *some* of them. At the start, let us focus on the non-providers that are just more of the same. The affidavit—as it relates to Callahan, Tislow, Bratcher, and Dollard—is sufficient to show that probable cause existed to arrest those four individuals. The allegations critical to this probable cause finding are that multiple undercover agents and former patients received pre-signed prescriptions from all four on various occasions.

Obviously this was not the only evidence that Agent Whisenand and his team had compiled; however, it is key because at least one court of appeals has held that evidence that a layperson knew of a clinic's use of pre-signed prescriptions paired with the fact that she sometimes distributed them herself is sufficient to support a federal criminal conviction for conspiracy to distribute controlled substances. *See Chaney*, 921

F.3d at 592. Combined with the other facts unearthed by the investigation, there was probable cause to arrest Callahan, Tislow, Bratcher, and Dollard for conspiracy and corrupt business influence.

As to Eric Ley, Reid, and Mackey, the affidavit did not establish probable cause to arrest these three non-provider employees. The key distinction here is that intent (or lack thereof) is now the issue, *not* an affirmative defense. The closest the affidavit comes to reaching probable cause for two of the three (Ley and Reid) are the allegations that they handed out prescriptions from doctors who had just signed them without examining the patients. In Reid's case, there was a single report from an undercover agent that he received a Suboxone prescription from Reid signed by Dr. Bangura, who was in the office but did not personally meet with the agent. In Mackey's, though, all investigators and agents observed Mackey do is walk in and out of the office with a clipboard, taking people's names down and arranging them outside, on top of interacting with vehicles in the parking lot.

There is a wealth of authority that suggests evidence of physicians who spend little to no time with patients is relevant in a pill mill prosecution. *See United States v. Stegawski*, 687 F. App'x 509, 513 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 282 (2017); *Votrobek*, 847 F.3d at 1342–43; *Elliott*, 876 F.3d at 865–66; *Oti*, 872 F.3d at 684–85, 688, 698; *Evans*, 892 F.3d at 707; *Azmat*, 805 F.3d at 1035–36; *United States v. Singleton*, 626 F. App'x 589, 597 (6th Cir. 2015) (collecting cases); *United States v. Kincaid*, 631 F. App'x 276, 280, 282 (6th Cir. 2015); *United States v. Dileo*, 625 F. App'x 464, 475–76 (11th Cir. 2015); *United States v. Sawaf*, 129 F. App'x 136, 142 (6th Cir. 2005).

But only one of those cases concerned a physician who did not examine patients *at follow-up appointments when the physician re-prescribed opioids. See Stegawski*, 687 F. App'x at 513. Additionally, agents and officers in those cases always had additional evidence of wrongdoing, not just the fact that somebody may have been aware that a doctor conducted little-to-no physical exams.

In this case, all Agent Whisenand had to go on was that doctors signed prescriptions and handed them to Ley and Reid to give to the patients. There is no evidence that Ley and Reid were "intimately involved with the schedules and prescribing practices of [the] physicians." *Singleton*, 626 F. App'x at 597. They did not "pressure[] doctors to see large numbers of patients," or "ensure[] that patients receive[] the drugs they wanted." *Id.* (citing *United States v. Johnson*, 831 F.2d 124, 128–29 (6th Cir. 1987) (explaining a clinic manager "was intimately involved in virtually every facet of administrating the clinic, including the hiring and firing of the doctors and staff, the recording of the receipts and the prescriptions, and the supervision of the employees who actually handed out the prescriptions and received the payments")).

It is not as if these clerical employees filled out the prescriptions themselves. *Cf. Kincaid*, 631 F. App'x at 280, 283; *Garrison*, 888 F.3d at 1061 (detailing how a receptionist received directives from the clinic's operators to prescribe the highest strength OxyContin to all patients regardless of necessity). The undisputed facts developed at summary judgment do not show that Ley and Reid knew that the prescriptions they were passing along were potentially invalid, especially when "cross-coverage situations" do not require independent physical exams for prescription renewals. 844 Ind.

Admin. Code 5-4-1. Agent Whisenand and his expert witnesses acknowledged as much when they testified that the law did not require an evaluation at each appointment.

The probable cause affidavit was lacking even more regarding Mackey. Again, the DEA essentially accused Mackey of being a glorified valet, situating people and cars in the parking lot. True, in some pill mill investigations, there is a security guard that patrols the premises with a firearm. *See, e.g., Oti*, 872 F.3d at 689. In *Kincaid*, for example, the security guard: collected cash payments; issued receipts; allegedly gave someone a pill; maintained a book of accounts; held onto pharmacy contracts (one of which he signed); had multiple pill bottles in his home when investigators searched it; and possessed tens of thousands of dollars in a safe-deposit box. 631 F. App'x at 283. As it happened, that defendant was much more than just a security guard.

Likewise, in *Elliott*, the security guard prevented investigators from uncovering the truth behind the clinic's practice. 876 F.3d at 863. He "chas[ed] away those who would watch the property[,] … he warned patients of [investigators'] presence, [and he] shuttled bags of prescriptions back and forth to a doctor for signature." *Id.* It was this— "his work in facilitating … prescriptions, and his warnings about government surveillance"—that transformed Elliott from innocent bystander into coconspirator. *Id.* at 864.

Here, however, there were no facts alleged in the affidavit that Mackey was ever armed, impeding investigations, handling money, or possessing narcotics. On the face of the affidavit, it seems as if Mackey did not have much more than a slight connection to the conspiracy. He was certainly not a

major actor in it. Indeed, Agent Whisenand did not summarize his individual criminal liability (or Reid's or Dr. Bangura's) like he did for all the other DORN employees. Reading the affidavit thus leaves the unmistakable impression that Mackey, along with Ley and Reid, were caught in the crosshairs of the conspiracy.

"The concept of guilt by association is repugnant to our notion of elemental justice and fair play." *Driebel v. City of Milwaukee*, 298 F.3d 622, 651 (7th Cir. 2002) (citation omitted); *see also United States v. Jones*, 713 F.3d 336, 352 (7th Cir. 2013) (collecting cases); *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, 291 F.3d 1000, 1022 (7th Cir. 2002) (same). That is why, generally speaking, "it is necessary to establish that the group possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Boim*, 291 F.2d at 1022 (citations omitted).

On intent, while probable cause does not "require the same type of specific evidence of each element of the offense as would be needed to support a conviction," *Adams*, 407 U.S. at 149, it does require police to marshal "*some* evidence" of the requisite mental state. *BeVier*, 806 F.2d at 126 (holding that the police "needed some evidence" of intent to establish probable cause under a statute proscribing knowing or willful conduct) (emphasis added); *see also Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007) (concluding that a police officer needed "some evidence" of intent to arrest an individual).

In this case, there is nothing in the probable cause affidavit indicating the intent of Ley, Reid, or Mackey. What is more, Agent Whisenand did not testify that he believed his investigation had revealed that these three individuals intended to

deal controlled substances. Agent Whisenand needed to obtain *some* evidence that Ley, Reid, or Mackey acted knowingly before he pursued them on charges of conspiracy to deal controlled substances and corrupt business influence. There is nothing in the record to show that he had any such evidence, that he attempted to obtain it, or that he in any way directed his investigation toward the elements of the crimes he arrested Ley, Reid, and Mackey for committing.

We should further emphasize the points we have just made about elements and investigations. *First*, one of the essential elements of a conspiracy is the specific intent to commit the underlying felony; in this case, dealing controlled substances. *See* Ind. Code Ann. § 35-41-5-2; *Lawrence v. State*, 665 N.E.2d 589, 592 (Ind. Ct. App. 1996); *see also United States v. Moore*, 641 F.3d 812, 825 (7th Cir. 2011) ("The evidence was directed toward Moore's intent and knowledge in distributing drugs, which are crucial considerations in establishing the intent necessary for conspiracy to distribute drugs."); *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007). So, too, with corrupt business influence in Indiana, which implicitly entails a specific intent to commit the underlying racketeering acts. *See* Ind. Code Ann. § 35-45-6-2(3). Many predicate offenses require specific intent themselves. *Cf. Ritchie v. Taylor*, 701 F. App'x 45, 47 (2d Cir. 2017) ("The various RICO predicate acts Ritchie proposes all require specific intent.").

When it comes to specific intent crimes, the need for probable cause on the intent element is particularly acute. *See Jordan*, 487 F.3d at 1355–56 (collecting cases). This is especially so in the context of long, drawn-out investigations where officers do not have to "*definitively* resolve difficult mens rea questions in the few moments in which officers have to decide whether

to make an arrest." *Wesby*, 816 F.3d at 107–08 (Kavanaugh, J., dissenting from denial of rehearing en banc) (collecting cases). Because officers must typically think on their feet, we usually allow an inference of specific intent from the defendant's conduct. *See United States v. Schwanke*, 694 F.3d 894, 896–97 (7th Cir. 2012) (collecting cases); *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000) (endorsing circumstantial evidence of criminal motive); *Stefani v. City of Grovetown*, 780 F. App'x 842, 849 (11th Cir. 2019).

Moreover, we have "repeatedly held that it is up to the courts, not police officers, to determine a suspect's mental state." *Shea v. Muensterman*, 2 F. App'x 528, 529 (7th Cir. 2001) (collecting cases). On the ground, it is not a police function to "sort[] out conflicting testimony and asses[] the credibility of putative victims and witnesses …." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745 (7th Cir. 2003) (collecting cases); *see also Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) ("Police have a hard time evaluating competing claims about motive; they are entitled to act on the basis of observable events and let courts resolve conflicts about mental states."); *Marks v. Carmody*, 234 F.3d 1006, 1009 (7th Cir. 2000).

Agent Whisenand's task was not to resolve credibility conflicts in a spur-of-the-moment judgment call. Quite the contrary, he led a yearlong investigation that amassed an array of evidence. The trouble here is that there were no "competing claims about motive" or "conflicts about mental states," let alone "observable events" on which to support probable cause to arrest Ley, Reid, and Mackey. *Hebron*, 18 F.3d at 423. Knowledge is a crucial element of the offenses Agent Whisenand arrested these DORN employees for committing.

Probable cause did not require Agent Whisenand to have certainty of their knowledge, but it did require *some* evidence—enough to confer on him a reasonable belief that they had committed criminal offenses—demonstrating that they had that knowledge. What Agent Whisenand knew at the time he arrested them was insufficient as a matter of law to establish probable cause as to their mental states.

*Second*, "[r]easonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place." *BeVier*, 806 F.2d at 128. It is not enough for an officer to choose not to explore further when doing so would undoubtedly shed light on the situation. *Cf. Driebel*, 298 F.3d at 644 (concluding that the police department "conducted a legally adequate inquiry by interviewing the victim … as well as numerous witnesses who gave sufficient corroborating testimony ….").

In these circumstances, without asking Ley, Reid, or Mackey (or any non-provider employee) a single question about DORN during the yearlong investigation—coupled with his lack of any other information as to what they might observed—Agent Whisenand had no "reasonably trustworthy information" as to what they knew about potential criminal activity. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). This information, frankly, should not be that hard to come by in pill mill prosecutions. *See DeLia*, 906 F.3d at 1215 (investigators questioned the clinic staff); *Chaney*, 906 F.3d at 578 (officers interviewed clinic employees). Without more, with the record developed to date, the undisputed facts did not give Agent Whisenand a reasonable basis to determine that they knowingly conspired to deal controlled substances and knowingly corrupt business influence. We cannot draw any inferences

from the absence of this information from the record now, which means Agent Whisenand lacked a reasonable basis to believe critical elements of the crimes existed then.

In sum, Agent Whisenand had to have some information from which a reasonable officer could conclude that Ley, Reid, and Mackey knowingly conspired to deal controlled substances and knowingly corrupted business influence. But there was no evidence introduced at summary judgment from which Agent Whisenand could have inferred what those DORN employees knew—an indispensable element of the offenses. Some evidence of that knowledge is necessary to establish probable cause that the DORN employees committed crimes. To hold otherwise would leave vulnerable to arrest any individual who unknowingly worked at a pill mill, no matter how innocent they are.[16] The Constitution prohibits such a result.

## C. Qualified Immunity

The question remains whether "a reasonable officer would have known that the evidence provided to support the warrant failed to establish probable cause." *Brunson*, 843 F.3d at 709 (citing *Williamson*, 714 F.3d at 442); *see also White v. City of Chicago*, 829 F.3d 837, 842 (7th Cir. 2016). Agent Whisenand faces personal liability only if "'courts have clearly held that a

---

[16] We reject the DORN employees' theory that ill will or malice motivated Agent Whisenand and his investigation. *See Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988) ("If probable cause exists, an arrest is not tainted because a police officer may dislike one of the actors in the underlying dispute, unless this is shown to be an important factor in the decision."). The DORN employees merely speculate on this point.

materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand' or if 'the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Edwards*, 907 F.3d at 1060 (quoting *Koerth*, 312 F.3d at 870).

Courts have not held that a materially indistinguishable affidavit previously failed to support probable cause. The analysis thus turns to whether the affidavit was so clearly deficient that any reasonable officer would have known that there was no probable cause and that an officer should not have applied for the warrant. We conclude that Agent Whisenand could have reasonably believed there was probable cause to attest that Ley and Reid—but not Mackey—had the requisite criminal mens rea to commit the crimes with which they were charged.

There is a dearth of Indiana case law touching on intent in drug conspiracy and racketeering cases, not to mention pill mill prosecutions. Conspiracy and racketeering statutes are broad by design. Of course, lack of intent will always be a defense to a charged crime and therefore a potential defect in a probable cause affidavit. But, on that score, the caselaw leaves a lot to be desired. It is clear, though, that many federal investigations have homed in on physical examination practices in so-called pill mills. Because the law in this area remains undeveloped, officers of reasonable competence could disagree on whether arrest warrants should have issued based on Ley and Reid's minimal knowledge of DORN's

physical exam practices. *Cf. Whitlock*, 596 F.3d at 413. Quali-fied immunity therefore protects Agent Whisenand from Ley and Reid's lawsuits.

Conversely, a reasonably competent officer should have known that there was no probable cause to believe that Mackey had the intent vital to the offenses that the warrant issued to arrest him for committing. *See Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007), *as amended* (Nov. 19, 2007); *see also Malley*, 475 U.S. at 345; *Whiteley v. Warden, Wyo. State Peniten-tiary*, 401 U.S. 560, 565 (1971). Since at least 1986, it has been clear to reasonable officers in this Circuit that they must har-bor "some evidence" of a crime's mens rea to support proba-ble cause to arrest. *See BeVier*, 806 F.2d at 126; *see also Belcher*, 497 F.3d at 748–50; *Juriss*, 957 F.2d at 349–50.[17] We think that is especially true in a case like this one: a yearlong investiga-tion that culminated in an arrest warrant application based on specific intent crimes.

Here, there was *no* evidence that Mackey ever dealt with the medical providers, let alone knew of their alleged miscon-duct. When confronted with how a lay employee would know that DORN was debatably violating a civil regulation, Agent Whisenand answered: "I would say to that the judge obvi-ously agreed with that. *They didn't know. They wouldn't know.* That's why their charges were dismissed." Then, when spe-cifically asked about Mackey's knowledge (or lack thereof) of DORN's medical exams in his deposition, Agent Whisenand initially replied that Yvonne Morgan, the nurse, would have known about it. The attorney then pressed Agent Whisenand

---

[17] We are certainly not alone in acknowledging this unexceptional proposition of law. *See Jordan*, 487 F.3d at 1355.

to respond to how Mackey would have known this, and Agent Whisenand said: "I don't know. I don't know how to answer that. I don't know."

When questioned later whether any of the low-level clerical staff or the parking lot attendant (Mackey) knew that doctors were prescribing medication without a legitimate purpose, Agent Whisenand stated: "I don't know. I can say that, you know, ultimately the charges – the State determines the charges, who gets charged and what they're being charged for."

Analyzing Agent Whisenand's testimony alongside the rest of the evidence in the record, we conclude that the undisputed facts do not demonstrate that a reasonably well-trained officer would have known that this affidavit established probable cause to arrest Mackey. There was no evidence admitted at summary judgment that Mackey had knowledge of whether the prescriptions handed out at the clinic were illegal or not. Because the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," Agent Whisenand should have known that he should not have applied for the warrant to arrest Mackey. *Malley*, 475 U.S. at 345.

At oral argument, we questioned counsel for Agent Whisenand about our concerns surrounding the non-provider employees. Counsel responded:

> So, if you look at the facts of the probable cause affidavit, and um, also these undercover videos, you would see that, what you deem the 'clerical employees' were mainly office managers, meaning they were running

the office. They were printing off prescriptions, handing them to the patients; sometimes, they were the only employee that the patient ever saw.

And so, while the appellants have tried to deem the non-medical employees as having very little involvement, in fact they were the central—in many cases— they were running the office. They, they were the only person with whom a patient ever had an interaction.

Tailoring our inquiry to Mackey, we asked again but this time only about him. Counsel for Agent Whisenand replied:

Again, your Honor, we would point you to the probable cause affidavit and, and, the undercover visits. The plaintiffs have called Mr. Mackey the 'parking lot attendant.' He was hired initially to be—to control the traffic—and to make sure no violent acts or drug deals were going on in the parking lots. He took on a larger role later. Um, he was bringing patients in, he was involved in—you are correct, the Kokomo office—um, his involvement became more extensive as time went on.

We cannot square these answers, however, with the allegations Agent Whisenand included in the probable cause affidavit. It is worth noting that Agent Whisenand referred to Mackey five times in his fifty-six-page affidavit. Mackey appears on pages 26, 43, 46, 48, and 51. We will walk through each identification one-by-one:

• Page 26: Seen entering the DORN Kokomo office was on this date [November 13, 2013] was Eric Ley. This office had a person (identified as Joseph Mackey)

located outside the office in the paring lot with a clipboard taking names and arranging people.

• Page 43: On April 16, 2014, TFO [Task Force Officer] Davie Richardson acting in an undercover capacity traveled to the assigned DORN office located 38217 South LaFountain Street, Kokomo, Indiana, and met with Joseph Mackey, Felicia Reid, and Cassy Bratcher. At the conclusion of the visit, TFO Richardson received a Suboxone prescription for "dependency" signed by Dr. Bangura in exchange for $80.00 cash. TFO Richardson received his prescription from Bratcher as she handed out prescriptions to several other unknown patients in the DORN waiting room.

• Page 46: On May 14, 2014, TFO Dave Richardson acting in an undercover capacity traveled to his assigned DORN office located at 3827 South LaFountain Street, Kokomo, Indiana, and met with Joseph Mackey and office assistant Felicia Reid. After submitting a urine screen (due to being an insurance patient) and paying $160 cash, TFO Richardson received a Suboxone prescription for "dependency" from Reid that was signed by Dr. Bangura.

• Page 48: On June 11, 2014, TFO Dave Richardson acting in an undercover capacity traveled to his assigned DORN office at 3827 South LaFountain Street, Kokomo, Indiana, where he met with Joseph Mackey, Felicia Reid, and Cassy Bratcher. TFO Richardson received a two week prescription for Suboxone signed by Dr. Bangura but never met with Dr. Bangura. TFO Richardson was told by Cassy Bratcher that TFO Richardson had to "exit" from the program due to TFO

Richardson's urine drug screens failing to show buprenorphine in his system.

• Page 51: On July 19, 2014, TFO Tonda Cockrell and TFO David Richardson conducted surveillance on the DORN office at 3827 S. Lafountain Street, Kokomo, Indiana in an attempt to identify the parking lot "arranger" known as "Joe." TFO Cockrell observed Dr. Bangura, Cassy Bratcher, Felicia Reid, and "Joe" at the premises. "Joe" was seen going in and out of the building and interacting with persons and vehicles in the parking lot … "Joe" was observed leaving around 7:17 p.m. in a Chevy Suburban. He was stopped by Kokomo Police Sgt. David Foster for a traffic violation. He was identified by Sgt. Foster as Joseph A. Mackey.

Agent Whisenand seemingly faults the plaintiffs for calling Mackey the "parking lot attendant," when Agent Whisenand views Mackey's role as remarkable. The problem with that theory is that Agent Whisenand himself referred to Mackey as the "parking lot arranger." More importantly, it apparently took the investigators nine months to identify Mackey, a man they surveilled "taking names and arranging people" on one occasion and "going in and out of the building and interacting with persons and vehicles in the parking lot" on another. The other remaining entries in the affidavit merely state an officer "met" with Mackey and others at the Kokomo office on three different dates. Crucially, the officer never described Mackey's participation in or awareness of the prescription transactions.

We are therefore left with a lack of evidence—either in Agent Whisenand's affidavit or the record more generally—giving him probable cause to arrest Mackey for intentional

criminal conduct. Maybe that is why Agent Whisenand neglected to summarize Mackey's individual criminal liability in the affidavit. Mackey was not, as Agent Whisenand's counsel described many non-provider employees, an "office manager[] … running the office." He was never "the only person with whom a patient ever had an interaction."

Contrary to counsel's contention, the record currently before us indicates he did not take "on a larger role later." Perhaps there is evidence that Mackey took on a larger role later, but that evidence was not so clear and undisputed that it was included in the motion for summary judgment. According to the affidavit, he was not "bringing patients in"; as a matter of fact, he was "arranging people" and "interacting with persons and vehicles in the parking lot." That is far from the formidable, "extensive" involvement that counsel sees in Mackey's file. Hence, these allegations simply cannot add up to probable cause to arrest Mackey.

One cannot be oblivious to the ongoing opioid epidemic. Indiana itself is no stranger to a recent outbreak of overdoses. *See, e.g.,* Press Release, U.S. Dep't of Justice, Justice Dep't Awards More Than $333 Million to Fight Opioid Crisis: $2,446,664 will support efforts to combat drugs and crime in the S. Dist. of Ind., (Dec. 13, 2019), https://www.justice.gov/usao-sdin/pr/justice-department-awards-more-333-million-fight-opioid-crisis. We recognize the important part the police must play in responding to this public health crisis, and that physician-run pill mills perpetuate this plague. On the record before us, however, we cannot sustain Mackey's arrest under the Fourth Amendment's Warrant Clause.

### D. Remaining Issues

As to the other arguments raised by the parties in their briefs, we can leave those in the capable hands of the district court to address in the first instance. The district court's decision rested on probable cause, and in the alternative, arguable probable cause, so it never had occasion to analyze malicious prosecution and false arrest claims under state law (if the plaintiffs so pleaded); Aaron Dietz and the City of Carmel's level of participation in the plaintiffs' arrests; the United States' amenability to suit; and any relevant defenses, whether they be forfeiture, immunity, or lack of notice. Our disposition on appeal—grounded in probable cause and qualified immunity—leaves only Mackey's claim(s) still live, so that should streamline these matters on remand.

### III. Conclusion

For the reasons stated above, we AFFIRM the district court's judgment in all respects except as to Joseph Mackey. As the judgment pertains to him, we REVERSE AND REMAND it for further proceedings consistent with this opinion.